247 F.2d 711
 69 A.L.R.2d 288
 Emma Jean BROWN, Executrix of the Estate of George R. Brown,
Deceased, Appellant,
v.
Martha R. MOORE, William W. Richardson, Jr., Julia R. Corbin
and Robert R. Richardson (William R. Ingraham).
 No. 12062.
 United States Court of Appeals Third Circuit.
 Argued Jan. 22, 1957.
Decided June 27, 1957, Rehearing Denied Aug. 16, 1957, Writ
of Certiorari Denied Nov. 25, 1957, See 78 S.Ct.
148.
 
 Edward O. Spotts, Pittsburgh, Pa., Melvin M. Belli, San Francisco, Cal. (Theodore M. Tracy, Pittsburgh, Pa., on the brief), for appellant.
 Harold E. McCamey, Pittsburgh, Pa. (Dickie, McCamey, Cilcote, Reif & Robinson, Pittsburgh, Pa., on the brief), for Martha R. Moore, William W. Richardson, Jr., Julia R. Corbin and Robert R. Richardson, appellees.
 Milton W. Lampropolos, Pittsburgh, Pa. (Smith, Buchanan, Ingersoll, Rodewald & Eckert, Pittsburgh, Pa., on the brief), for William R. Ingraham, appellee.
 Before BIGGS, Chief Judge, and McLAUGHLIN and HASTIE, Circuit Judges.
 BIGGS, Chief Judge.
 
 
 1
 Jurisdiction in this case is based on diversity of citizenship and jurisdictional amount. Suit was brought in the United States District Court for the Western District of Pennsylvania. The operative facts occurred in Pennsylvania. There is no doubt that the substantive law of Pennsylvania governs. Klaxon Co. v. Stentor Elec. Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 and Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Our difficulty lies in trying to ascertain the law of Pennsylvania.
 
 
 2
 The plaintiff, the widow and executrix of George R. Brown (Brown), by her amended complaint, set up a cause of action arising under the Pennsylvania Wrongful Death Act, 12 P.S.Pa. 1601, 1602, for the benefit of herself and her three minor children, and also a cause of action arising under the Pennsylvania Survival Act, 20 P.S.Pa. c. 3, Appendix, 772. The defendants[1] are persons, who, with others, operated a private sanitarium for profit in Mercer, Pennsylvania under the style of 'Mercer Sanitarium for the Treatment of Mental and Nervous Diseases' (Sanitarium) under the Pennsylvania Fictitious Names Act, 54 P.S.Pa. 21. The Sanitarium is said to have been licensed to do business under Article II, Section 201(c) of Pennsylvania Public Law No. 414, Laws of Pennsylvania 1923, pp. 998, 1000, 50 P.S.Pa. 1091(b).
 
 
 3
 The plaintiff contends that Brown's death, to employ the words of the amended complaint, resulted proximately from the 'general, several and concurrent negligence' of the defendants acting 'through their servants, agents and employees * * * within the scope of their agency and employment.' In short, the plaintiff asserts that Brown was so negligently treated and with such a lack of professional skill by Dr. John L. Kelly, a neuro-psychiatrist, the 'Medical Director' of the Sanitarium, and by its staff that his death resulted therefrom. The defendants assert that Dr. Kelly was 'an independent contractor' and therefore the defendants themselves are not liable for any begligent or unskillful performance on his part. They also contend that they are relieved of all liability by reason of a release executed by the plaintiff and Brown and by an indemnification agreement executed by the plaintiff.
 
 
 4
 The case was tried to a jury which gave substantial damages to the plaintiff on both causes of action. The court below, however, granted motions made by the defendants for a directed verdict on the theory that Dr. Kelly was an independent contractor and that the defendants therefore could not be held liable for his negligence. See 1956, 143 F.Supp. 816. The court below directed in its final order that 'judgment' be entered in favor of all the defendants including the third party defendant Ingraham. The appeal[2] follwed.
 
 
 5
 The jury having found a verdict for the plaintiff all inconsistencies in the evidence must be resolved in her favor. So resolving them we state the following as the operative facts. Brown, a neurotic who believed that he was fuffering from cancer, was sent to the Mercer Sanitarium for rest by his Pettsburgh neuro-psychiatrist, Dr. H. B. Finkelhor. While at the Sanitarium Brown was given at least two elector-shock treatments. The second treatment was administered apparently on the morning[3] of September 9, 1949. Following the treatment Brown was permitted to become ambulatory. He went to the second floor of the main building of the Sanitarium for massage and, having had it, fell down a flight of steps in the afternoon of the same day. There was evidence from which the jury could have found that Dr. Kelly, the neuropsychiatrist and the individual 'in charge' of the Sanitarium, failed to exercise reasonable care and professional skill in permitting Brown to descend the flight of steps unattended following the electro-shock treatment, and that Brown fell down the steps because of this lack of care and of reasonable exercise of professional skill.
 
 
 6
 The noise of Brown's fall alarmed the Sanitarium staff who ran to help him. There was evidence from which the jury could have found that Dr. Kelly was not present at the time that Brown was picked up and carried to a bed in the adjoining treatment room. It is clear that Brown was carried to a bed by a least four persons who improperly held him by his extremities, with his head hanging down. Brown complained that he had broken his neck in the fall and that he had suffered partial paralysis. He was removed to his own bed in his own room and by this time his arms and legs were paralyzed. Dr. Kelly and another doctor who was later called in from the town of Mercer to assist Dr. Kelly concluded the Brown had suffered no real or substantial injury and that his condition resulted simply from hysteria. Brown never received proper, adequate or skillful medical treatment. In fact the treatment accorded Brown was such as probably to aggravate his condition. There was evidence from which the jury was entitled to find that Dr. Kelly was guilty of malpractice. That malpractice involved 'medical' acts requiring professional skill as distinguished from 'administrative' acts.[4] The jury was entitled to find, as it did, that Brown's death resulted from Dr. Kelly's improper and inadequate treatment.[5]
 
 
 7
 We point out that a person going to a doctor for treatment impliedly contracts with him for treatment and under the law of Pennsylvania if the doctor fails to afford proper treatment and care a malpractice suit sounding in tort can be maintained.[6] In is also the law of Pennsylvania that partners are liable for trespass by themselves or by their employees in the legitimate course of the partnership business. 59 P.S.Pa. 35, and Baxter v. Wunder, 1927, 89 Pa.Super. 585.
 
 
 8
 We come now to the central issue in the case. Can the defendants, partners in the operation of the Sanitarium as the court below correctly concluded them to be, be liable for Dr. Kelly's malpractice?[7] There was evidence that the defendants had no control of Dr. Kelly in the performance of his professional duties, albeit one of the defendants, William W. Richardson, Jr., was a doctor. It is the defendants' contention and one that finds support in the law of some of the States, 19 A.L.R. p. 1183, 5, that a doctor who is employed in a hospital to perform professional duties and is not subject to the control of the hospital is an independent contractor, and that the hospital which makes the doctor available is not liable to a third person for the doctor's negligence so long as the doctor has been selected with reasonable care by the hospital. This doctrine came into the law of some of the States, perhaps of a majority, following the decision of the Court of Appeals of New York, written by Judge (later Mr. Justice) Cardozo, in Schloendorff v. New York Hospital, 1914, 211 N.Y. 125, 105 N.E. 92. The Schloendorff decision was overruled very recently by the Court of Appeals of New York in Bing v. Thunig (St. John's Episcopal Hospital), 1957, 2 N.Y.2d 656, 163 N.Y.S.2d 3, 7, 143 N.Y.S.2d 3. New York has received the doctrine earlier from the Supereme Judicial Court of Massachusetts which had held in McDonald v. Massachusetts General Hospital, 1876, 120 Mass. 432, that a charity patient negligently operated on by a student doctor could not hold the hospital liable, the court stating in substance that the donations which supported the charitable institution constituted a trust fund which could not be diverted by a tort claim. As is pointed out by Judge Fuld in his brilliant opinion in the Bing case, supra, the Massachusetts court as its sole authority 'relied on an English case (Holliday v. St. Leonard's, 11 C.B.N.S. 192, 142 Eng.Rep. 769), which in turn was based on a dictum in a case decided in 1839 (Duncan v. Findlater, 6 Cl. & Fin. 894, 7 Eng.Rep. 934), failing, apparently, to note case had been overruled (see Mersey Docks Trustees v. Gibbs, (L.R.) 11 H.L.Cas. 686) and that the decision in the other had been reversed. (See Foreman v. Mayor of Canterbury, (L.R.) 6 Q.B. 214.).'
 
 
 9
 Judge Fuld in note 1, cited to the text of his opinion in the Bing case, cogently quoted in part from the decision of the Supereme Court of Washington in Pierce v. Yakima Valley Memorial Hospital Ass'n, 1953, 43 Wash.2d 162, 167, 260 P.2d 765, 768, as follows: 'Ordinarily, when a court decides to modify or abandon a court-made rule of long standing, it starts out by saying that 'the reason for the rule no longer exists.' In this case, it is correct to say that the 'reason' originally given for the rule of immunity never did exist.' We agree with the view that the reason originally given for the rule of immunity never did exist but it has stood for some eighty years in State courts.[8]
 
 
 10
 In Gable v. Sisters of St. Francis, 1910, 227 Pa. 254, 76 A. 1087, the Supreme Court of Pennsylvania made it plain that a public charitable hospital was immune from liability arising from the torts of its servants on the theory that the charitable funds given for its maintenance would be destroyed if they could be reached by judgment. The principle of the Gable decision is, of course, not applicable here for the Mercer Sanitarium was conducted for profit. There is no decision of the Supreme Court of Pennsylvania nor of the Superior Court of Pennsylvania which deals with the liability of a private hospital or sanitarium run for profit.
 
 
 11
 It is possible of course in view of the Being decision of the Court of Appeals of New York-- a court whose decisions we believe to have great weight with the Supreme Court of Pennsylvania-- that that Court might adopt the enlightened rule of the Bing case in respect to both public and private hospitals. Other strong courts have adopted a similar rule.[9] But it is not necessary to go so far. We are of the opinion that the Supreme Court of Pennsylvania would hold that a neuropsychiatrist, such as Dr. Kelly, a 'Medical Director' employed at a salary to run a sanitarium maintained for private profit, and to give treatments therein, is an agent or employee of those who own the sanitarium and that the application of the rule of respondeat superior applies. Conversely we do not see how a 'Medical Director,' engaged as under the circumstances at bar, can be an independent contract[10] and the doctrine of the independent contractor seems completely inapplicable under the facts of the case at bar.
 
 
 12
 We find some traces of Pennsylvania law presently in being and applicable to the case at bar in the dissenting opinion of Mr. Justice Allen M. Stearne, in which Mr. Justice Patterson Joined, in McConnell v. Williams, 1949, 361 Pa. 355, 367-368, 65 A.2d 243, 249. In this case a patient was suing a doctor, a surgeon, for the the negligence of another doctor, an interne. Mr. Justice Stearne said that the hospital in which the surgeon had performed a Caesarian section with the interne assisting him was not organized for profit but was maintained and conducted by charitably minded citizens and that such an institution was insulated from liability arising because of the negligent acts of any of its servants and employees but he went on to say: 'They (the majority) commence with a false premise, upon which they have erected an erroneous hypothesis. It is assumed that a charitable or public hospital has the same attributes that would exist if the surgeon conducted a private hospital, where the doctrine of respondeat superior would apply. A private hospital, however, is operated for profit and consequently the owners are responsible for the negligence of their servants and agents as they would be if engaged in any other business enterprise.'[11] Cf. Restatement, Agency 214, and Dickerson v. American Sugar Refining Co., 3 Cir., 1954, 211 F.2d 200, 203.
 
 
 13
 This is a statement of the views of two former Justices of the Supreme Court of Pennsylvania to the effect that a private hospital operated for profit is responsible for the negligence of its servants and agents and that a doctor may be an employee of a hospital. It should be noted that in 1949 while Mr. Justice Stearne and Mr. Justice Patterson might not have approved the broad general principle enunciated in the Bing case, supra, nonetheless the two Justices were of the view that the Supreme Court of Pennsylvania would have ruled that the owners or operators of a hospital maintained for profit would be held liable for the torts of their agents and servants.
 
 
 14
 But even if we assume-- though we think that such an assumption would be erroneous-- that the Supreme Court of Pennsylvania would rule that Dr. Kelly under the circumstances at bar was an independent contractor, there is another cogent factor which we think would compel the Courts of the Commonwealth of Pennsylvania to hold the defendants liable in the case at bar.
 
 
 15
 What is that factor? We are of the opinion that thwere there has been a holding out, a representation to a patient or to his family as members of the public, that medical treatment is to be administered in a private hospital or sanitarium by a doctor employed therein, the Courts of the Commonwealth of Pennsylvania would apply the doctrine of respondeat superior and hold the owners or operators of the sanitarium liable for the malpractice of the doctor. In other words Doctor Kelly could be regarded as having the status of an independent contractor in his relation to the partners in the Sanitarium but in his relation to Brown would be deemed to be an employee of the Sanitarium.
 
 
 16
 Does the evidence show that there was such a holding out? There was the evidence of William T. Brown, Brown's brother who took him to the Sanitarium, that he did not know who the Sanitarium doctor was. Dr. Finkelhor, Brown's Pittsburgh neuro-psychiatrist, testified that he sent Brown to the Sanitarium because he knew Dr. McKay who had been in charge of the Sanitarium, but Dr. McKay had died months prior to September 5, 1949 when Brown was taken to the Sanitarium. The plaintiff's testimony was to the effect she too had believed Dr. McKay to be in charge. The release executed by the plaintiff and by Brown to the Sanitarium is particularly significant. It stated that the undersigned, the plaintiff and Brown, 'does hereby give The Mercer Sanitarium permission to administer any form of recognized medical treatment, including Electro-Shock Therapy, to George R. Brown which is deemed advisable by the Medical Staff of said Sanitarium and does hereby release The Mercer Sanitarium and its employees from any damage on this account.' It would have to be conceded, we believe, that the Sanitarium doctor was the only person who administered electro-shock therapy to Brown or to any other patient. The language of the release is therefore capable of the inference that the Sanitarium held itself out as administering treatments and that 'its employees' administered or were to administer the treatments. Since the doctor invariably acted to give the electro-shock treatments the statements of the release are susceptible to the interpretation that Dr. Kelly was one of 'the employees' of the Sanitarium. True, the release states that such medical treatment was to be given as the 'Medical Staff' 'Deemed advisable' but the first line of the release italicized above states that the permission was given to the Sanitarium to administer treatments.
 
 
 17
 The contract of indemnification, executed by the plaintiff alone, provides in pertinent part that the plaintiff will 'indemnify The Mercer Sanitarium from any loss resulting from injury to or injury or damage caused by George R. Brown while a patient of Dr. J. L. Kelly and the said Sanitarium. * * *'[12] If Dr. Kelly had the status of an independent contractor in his relation to Brown and was not held out to the plaintiff and to Brown as one of the Sanitarium employees, why should such language have been employed? Moreover, if it was not held out or represented to Brown that he was a patient[13] of the Sanitarium why should he have been described literally as a 'patient' of the Sanitarium?
 
 
 18
 There are other items of evidence, serveral of them also documentary, which are pertinent to the inquiry as to whether the Sanitarium held itself out to the plaintiff and Brown as offering reasonable medical care and attendance to Brown. We shall deal with only three more such items here. Brown's 'Office Record' is headed 'The Mercer Sanitarium.' A bill was submitted on September 6, 1949 by 'The Mercer Sanitarium' 'For Services Rendered Mr. George R. Brown from September 5, 1949, to September 19, 1949.' This bill is itemized for 'Care and Treatment' $130. and for either 'Shock Treatments' or a 'Professional Fee,' $10.00. Whether the charge was for 'Shock Treatments' or was a 'Professional Fee,' the language used would sustain the inference that the Sanitarium was giving shock or other treatments for a fee.[14] According to the bill all bills were payable two weeks in advance and this bill was rendered to Brown on the day after he arrived at the Sanitarium. It was paid by Brown by his own check, drawn to the order of the Sanitarium. It is peculiarly pertinent that the record shows that the Sanitarium collected the fees and that Dr. Kelly was paid a salary. There was not the 'immediate and unbroken relationship between a professional man and those who engage his services' pointed out as essential in order to maintain the doctor-patient relationship by the Supreme Court of Pennsylvania in Neill v. Gimbel Brothers, Inc., 1938, 330 Pa. 213, 219, 199 A. 178, 181. Note also that Business Manager Ingraham testified that Dr. Kelly was 'in charge' of the Sanitarium.
 
 
 19
 We are of the opinion that the evidence presented was sufficient to entitle the jury to find that the defendants held out to the plaintiff and to Brown that the Sanitarium through Dr. Kelly and the staff would furnish Brown reasonably skillful medical care and attendance.
 
 
 20
 There is a single Pennsylvania decision which is close to being in point to the case at bar on the issue of a holdingout or representation. It is Ulbrich v. Boone County Coal Corporation, 1931, 16 Pa.Dist. & Co. 315-316, a decision of the Court of Common Pleas of Philadelphia County. In the Ulbrich case it appeared that the Coal Company collected sums of money from its employees and contracted to given them the services of a doctor in return for their contributions. The physician employed by the Coal Company negligently treated an employee's injured hand. It appeared from the statement of claim that the sums received by the Coal Company from its employees under the contribution system were more than it required to pay the expenses of maintaining the servict and that there was a large profit which the Coal Company appropriated to its own use. The court stated:
 
 
 21
 'The defendant has stated the general principle that the doctrine of respondeat superior does not apply in the case of injury done to an employee by the unskillful or careless treatment of a physician employed to treat the employees of a company; that one who employs a physician to administer to others without profit to himself is liable only for the failure to exercise due care in the selection and choice of a compentent and skillful physician.
 
 
 22
 'While these principles are sound and recognized generally, they have no application to this case because of the averment in the statement (of claim) that the defendant furnished these services to its employees for profit. Such being the case, the defendant is in no better position than one who holds himself out to offer medical treatment for gain, who is, under such circumstances, brought within the rule of master and servant and, therefore, liable for the carelessness or negligence of its employees. * * *'[15]
 
 
 23
 While a ruling of a Court of Common Pleas of Pennsylvania is not binding on us or on the court below, Eckman v. Baker, D.C., 126 F.Supp. 656; 3 Cir., 1955, 224 F.2d 954, 956, nonetheless statements in an opinion of such a Court are indicative of what the law of Pennsylvania may be. It is the duty of the federal courts where, as here, the State law supplies a rule of decision to ascertain and apply that law 'even though it has not been expounded by the highest court of the State,' Fidelity Union Trust Co. v. Field, 1940,311 U.S. 169, 177-178, 61 S.Ct. 176, 178, 85 L.Ed. 109.
 
 
 24
 The Ulbirch decision is a well reasoned one and it must be borne in mind that the Supreme Court of Pennsylvania has never ruled on the question of the liability of the operators of a private hospital for the malpractice of a physician held out as being employed therein. We conclude that the Supreme Court of Pennsylvania would rule that it was a question for the jury under proper instructions from the trial court as to whether or not the defendants had held out or represented Dr. Kelly to be their employee to administer treatment to Brown. See the leading case of Hannon v. Siegel-Cooper Co, 1901, 167 N.Y. 244, 60 N.E. 597, 52 L.R.A. 429, and the Ulbirch decision, supra. We are of the opinion that the law of Pennsylvania is in accord with this decision. If the answer to that question of fact was in the affirmative, and it must be presumed that the jury in the instant case so answered it, the Supreme Court of Pennsylvania would deem the doctrine of respondeat superior properly applicable to render the defendants herein liable on the doctrine of holding out or representation.
 
 
 25
 We are of the opinion that the charge was adequate to impose liability on the defendants on either of the two aspects of the case relating to the application of the principle of respondeat superior, which we have elucidated. We preceive no error in the charge which would require setting aside the verdicts of the jury and the judgments in favor of the plaintiff entered thereon.
 
 
 26
 This brings us to the issue of the release. The release consists of two parts which we have quoted at an earlier point in this opinion. The first part gave the Sanitarium permission to administer any form of recognized medical treatment, including electro-shock therapy, to Brown which was deemed advisable by the medical staff of the Sanitarium. The second part of the document, which may properly be described as the releasing part, releases the Sanitarium and its employees 'from any damages on this account.' The plain intent of the release was to relieve the Sanitarium of liability for any injury resulting to Brown from his treatment as a neurotic at the Sanitarium, from electro-shock therapy or treatment of a similar nature. By its terms it obviously was not intended to release the Sanitarium from liability for injury to Brown caused by treatment of any other kind than that given to him as a neurotic. The medical treatment, if it can be called such, which Brown received following his fall down the flight of stairs had no legal causal connection with his treatment as a neurotic by electro-shock therapy or by any other similar therapeutic means. We hold therefore that the release is insufficient to relieve the defendants of liability for the negligent medical treatment of Brown, as both the jury and the court below found it to be, following his fall bown the stairs. The effect of the release was purely a question of law for, as stated by the court below, no issue of fact was presented. Since the release by its terms could not have relieved the partners from the negligent acts of Dr. Kelly, the court below committed no error in failing to charge as to the effect of the release.
 
 
 27
 We regard the foregoing as dispositive of the issue presented by the release but since this case may well come before the reviewing Court we point out that even if the release were deemed sufficient to relieve the defendants of liability under the Pennsylvania Survival Act is could scarcely relieve them of liability under the Pennsylvanis Wrongful Death Act for that Act provides benefits not only for the widow of a deceased person but also for his children. Even assuming that the release was effective as to the plaintiff, who executed it as did Brown, nonetheless Brown's children would be entitled to a recovery. If the release were deemed to be sufficient it would bar recovery by the plaintiff in her suit based on the Pennsylvania Survival Act since the right given thereby arises under a Lord Campbell's Act type statute and Brown himself would be barred.
 
 
 28
 As to the indemnification agreement, it is the law of Pennsylvania that indemnification agreements are to be construed strictly 'with every intendmentagainst the party seeking its protection.' Crew v. Bradstreet Co., 1890, 134 Pa. 161, 19 A. 500, 7 L.R.A. 661. In Camden Safe Deposit & Trust Co. v. Eavenson, 1927, 295 Pa. 357, 364, 145 A. 434, 436, the Supreme Court of Pennsylvania said: 'A party may contract for indemnity against the results flowing from his own acts; but 'no inference from words of general import can establish it'; on the contrary, 'the intent of both parties to that effect (must) be made apparent by clear, precise and unequivocal language."
 
 
 29
 In Perry v. Payne, 1907, 217 Pa. 252, 262, 66 A. 553, 557, 11 L.R.A.,N.S., 1173, the Court said: 'We think it clear, on reason and authority, that a contract of indemnity against personal injuries, should not be construed to indemnify against the negligence of the indemnitee, unless it is so expressed in unequivocal terms. The liability on such indemnity is so hazardous, and the character of the indemnity so unusual and extraordinary, that there can be no presumption that the indemnitor intended to assume the responsibility unless the contract puts it beyond doubt by express stipulation. No inference from words of general import can establish it. The manifest purpose, in such cases, to indemnify against the injury which, under the circumstances, could reasonably be apprehended only from the action of the indemnitor or his servant, is a weighty consideration in construing indemnity contracts.'
 
 
 30
 It appears therefore under the law of Pennsylvania that if an indemnitee is to procure protection from loss resulting from his own negligence of from that of his employees or servants, the purpose or intent to effect such indemnification must be expressed in unequivocal terms in the instrument itself. The indemnification agreement in the case at bar in no wise expresses in unequivocal terms an intent or purpose on the part of the plaintiff to indemnify the defendants for loss resulting from the negligence or malpractice of Dr. Kelly or the Sanitarium staff.
 
 
 31
 We so construe the indemnification agreement and we think that it is clearly apparent that no question as to its effect was presented for determination by the jury, but assuming arguendo that it was a jury question, the defendants requested no charge as to the agreement and the court did not charge in respect to it. There was no objection by the defendants to the failure of the court to charge in respect to the agreement as required by Rule 51, Fed.R.Civ.Proc., 28 U.S.C. If there was a question for the jury the defendants have lost the opportunity to avail themselves of it.
 
 
 32
 The judgment of the court below will be reversed and the cause remanded with the direction to reinstate the judgments in favor of the plaintiff.
 
 
 
 [1]
 The third-party defendant, Ingraham, was brought upon the record by certain of the defendants named in the complaint as it was prior to the amendment
 
 
 [2]
 There were, as we have stated, two causes of action and the jury gave verdicts in favor of the plaintiff on both of them. Judgments were entered on these verdicts by the Clerk pursuant to Rule 58, Fed.R.Civ.Proc., 28 U.S.C. The court, however, gave 'judgment' in favor of the defendants, one judgment, not two. An 'appeal' was taken; not two appeals. The failure of the court below to enter two judgments was an obvious clerical error which could have been corrected at any time prior to the filing of the notice of appeal. Rule 60(a) Fed.R.Civ.Proc., 28 U.S.C. We conclude that we are justified in treating the plaintiff's appeal as going to both the judgments entered against her rather than vacate the judgments and remand to a presently very much overburdened United States District Court for technical correction
 
 
 [3]
 The records of the Sanitarium were inadequately kept. Some of them seem to have been made after the happening of events complained of by the plaintiff
 
 
 [4]
 Pennsylvania adheres to the difficult doctrine that there is a distinction between 'medical' acts and 'administrative' acts. Benedict v. Bondi, 1956, 384 Pa. 574, 580-581, 122 A.2d 209, 212. This doctrine was carried into the law of most of the States which have followed the decision of the Court of Appeals of New York in Schloendorff v. New York Hospital, 1914, 211 N.Y. 125, 105 N.E. 92, 52 L.R.A.,N.S., 505. But as was said by the Court of Appeals of New York in Bing v. Thunig (St. John's Episcopal Hospital) 2 N.Y.2d 656, 163 N.Y.S.2d 3, 143 N.E.2d 3, 4, 'a consistent and clearly defined distinction between the terms ('medical' acts and 'administrative' acts) has proved to be highly elusive,' citing numerous New York decisions. Perhaps the most interesting of these are Necolayff v. Genesee Hospital, 1947, 296 N.Y. 936, 73 N.E.2d 117, holding that administering blood by means of a transfusion to the wrong patient is administrative, and Berg v. New York Soc. for Relief of Ruptured and Crippled, 1956, 1 N.Y.2d 499, 154 N.Y.S.2d 455, 136 N.E.2d 523 holding that administering the wrong blood to the right patient is medical. In our opinion the furnishing of attendance following electro-shock therapy to a patient, as in the case at bar, is a medical act because the physician, the neuro-psychiatrist, who administered the shock must determine the extent and duration of the attendance required to safequard the patient. It is unnecessary to treat with this subject further in this opinion for we are of the view that insufficient evidence was presented to the jury to find on the present record that Brown died because of improper 'administrative' acts, though there were several of them
 
 
 [5]
 Dr. Kelly named originally as a defendant was removed from the record by the amendment to the complaint. The reason for the removal was apparently because Dr. Kelly had become a citizen of Pennsylvania. Therefore if he remained a defendant the diversity necessary to maintain jurisdiction would be lacking
 
 
 [6]
 There is no question that under the law of Pennsylvania as under that of most of the States a failure to perform a duty imposed by contract or to fulfill a representation may constitute a tort. See Todd v. Figley, 1838, 7 Watts, Pa., 542; M'Cahan v. Hirst, 1838, 7 Watts, Pa., 175; Smith v. Seward, 1846, 3 Pa. 342; Reeside's Executor v. Reeside, 1865, 49 Pa. 322; Zell v. Dunkle, 1893, 156 Pa. 353, 27 A. 38; Eckert v. Pennsylvania R.R. Co., 1905, 211 Pa. 267, 60 A. 781; Hirsch v. Iron City Sand & Gravel Co., 1924, 73 Pittsb.L.J. 205; Peters v. Webb, C.P. Bucks County 1950, 1 Bucks Co.L.Rep. 253; Marcus v. N.J. & Plate Glass Ins. Co., C.P. Luzerne Co.1915, 18 Luz.L.Reg.Rep. 221. As to law generally, see 1 C.J.S. Actions, 49
 A person going to a doctor for treatment impliedly contracts with him for treatment and under the law of Pennsylvania if the doctor fails to afford reasonably proper treatment and care a malpractice suit sounding in tort can be maintained. See Powell v. Risser, 1953, 375 Pa. 60, 99 A.2d 454, trespass; Scacchi v. Montgomery, 1950, 365 Pa. 377, 75 A.2d 535, trespass for wrongful death; Schull v. Schwartz, 1950, 364 Pa. 554, 73 A.2d 408, trespass for malpractice; McConnell v. Williams, 1949, 361 Pa. 355, 65 A.2d 243, trespass for personal injuries; Bierstein v. Whitman, 1949, 360 Pa. 537, 62 A.2d 843, trespass.
 
 
 [7]
 We observe that the plaintiff struggled valiantly against every effort made by the trial court to designate the defendants and those engaged with them in the ownership and management of the Sanitarium as 'partners.' The court in its charge called the defendants 'partners,' stating: 'It is undisputed that the defendants and the third-party defendant (Ingraham) are partners. * * *' If the defendants and those engaged with them in the operation of the Sanitarium were co-partners in the Sanitarium enterprise under the Pennsylvania Uniform Partnership Act, 59 P.S.Pa. 1 et seq., there can be no doubt that each partner would be jointly and severally liable for the tortious act of any other partner. There was evidence on the issue of whether or not Dr. Kelly could be deemed to be a member of the partnership. Note the offer of partnership contained in the letter of February 5, 1949, written by Ingraham, the General Manager of the Sanitarium, to Dr. Kelly and Ingraham's testimony at the trial. This evidence was susceptible to the inference that Kelly conducted the Sanitarium's medical treatments while Ingraham ran the business end of the venture, and that they worked co-jointly and to their mutual interest to maintain the Sanitarium unit. The fact that Dr. Kelly was engaged in professional work and Ingraham carried on administrative duties, he not being entitled, since he was not a doctor, to practice medicine, would not militate against the creation of a partnership. See Neill v. Gimbel Bros., Inc., 1938, 330 Pa. 213, 199 A. 178, but see the interrogatories and the answers thereto which indicate that Dr. Kelly received no share of the profits of the Sanitarium. In any event the court did not charge the jury on any possible issue of Dr. Kelly being a co-partner with the defendants in the Sanitarium enterprise and the plaintiff did not request such a charge or object to the lack of it. The issue is therefore unavilable to the plaintiff on the present record
 As to the supervision of Dr. Kelly by the partners, it should be noted that one of the defendants, William W. Richardson, Jr., was a doctor. The record is silent as to whether he was licensed to practice medicine in Pennsylvania. The evidence shows that at the time of the happening of the events complained of Dr. Richardson was in charge of a private sanitarium in the State of Washington. While such an absence would not necessarily have relieved him of the duty of supervision of Dr. Kelly, the plaintiff again raised no issue as to such supervision and it is therefore unavailable to her on the present record.
 We also apprehend that the plaintiff misunderstood the nature of the law of Pennsylvania and was perhaps unaware that an action of tort could grow out of a breach of duty imposed by contract. If the suit was for breach of contract the liability of the partners might have been construed to be joint, not joint and several as would be their liability in tort. See The Pennsylvanis Uniform Partnership Act, 59 P.S.Pa. 35-37. All the partners would then have been indispensable parties. But if all the partners were brought upon the record, including those resident in Pennsylvania, as they had been by the complaint as it was prior to the amendment, diversity jurisdiction would have been lost.
 
 
 [8]
 Judge Fuld stated: 'The conception that the hospital does not undertake to treat the patient, does not undertake to act through its doctors and nurses, but undertakes instead simply to procure them to act upon their own responsibility, no longer reflects the fact. Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and internes, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action. Certainly, the person who avails himself of 'hospital facilities' expects that the hospital will attempt to cure him, not that its nurses or other employees will act on their own responsibility
 'Hospitals should, in short, shoulder the responsibilities borne by everyone else. There is no reason to continue their exemption from the universal rule of respondeat superior. The test should be, for these institutions, whether charitable or profit-making, as it is for every other employer, was the person who committed the negligent injury-producing act one of its employees and, if he was, was he acting within the scope of his employment.
 'The rule of nonliability is out of tune with the life about us, at veriance with modern-day needs and with concepts of justice and fair dealing. It should be discarded. To the suggestion that stare decisis compels us to perpetuate it until the legislature acts, a ready answer is at hand. It was intended, not to effect a 'petrifying rigidity,' but to assure the justice that flows from certainty and stability. If, instead, adherence to precedent offers not justice but unfairness, not certainty but doubt and confusion, it loses its right to survive, and no principle constrains us to follow it. On the contrary, as this court, speaking through Judge Desmond in Woods v. Lancet, 303 N.Y. 349, 355, 102 N.E.2d 691, 694, declared, we would be abdicating 'our own function, in a field peculiarly nonstatutory,' were we to insist on legislation and 'refuse to reconsider an old and unsatisfactory court-made rule.'
 'In sum, then, the doctrine according the hospital an immunity for the negligence of its employees is such a rule, and we abandon it. The hospital's liability must be governed by the same principles of law as apply to all other employers.'
 
 
 [9]
 See Wheat v. Idaho Falls Latter Day Saints Hospital, Idaho 1956, 297 P.2d 1041; Pierce v. Yakima Valley Memorial Hospital Ass'n, 1953, 43 Wash.2d 162, 260 P.2d 765; Waynick v. Reardon, 1952, 236 N.C. 116, 72 S.E.2d 4; Ray v. Tucson Medical Center, 1951, 72 Ariz. 22, 230 P.2d 220; Durney v. St. Francis Hosp., 1951, 46 Del. 350, 83 A.2d 753; Haynes v. Presbyterian Hospital Ass'n, 1950, 241 Iowa 1269, 45 N.W.2d 151; Rickbeil v. Grafton Deaconess Hospital, 1946, 74 N.D. 525, 23 N.W.2d 247, 166 A.L.R. 99; Treptau v. Behrens Spa, Inc., 1945, 247 Wis. 438, 20 N.W.2d 108; Hansch v. Hackett, 1937, 190 Wash. 97, 66 P.2d 1129; Jenkins v. General Hospital, 1922, 90 W.Va. 230, 110 S.E. 560, 22 A.L.R. 323; and O'Brien v. American Casualty Company, 1910, 58 Wash. 477, 109 P. 52
 
 
 [10]
 It is the law of Pennsylvania that an individual employing an independent contractor is not liable for the latter's negligent acts if reasonable care has been exercised in the selection of the independent contractor. Here one of the partners was a doctor. See Note, 7, supra. The Supreme Court of Pennsylvania, however, has gone further in the direction of protecting him who has engaged an independent contractor from liability for the contractor's negligence than most State courts for the Supreme Court of Pennsylvania has held that there is a presumption that the independent contractor has been selected with due care. Silveus v. Grossman, 1932, 307 Pa. 272, 161 A. 362; Mansfield Coal & Coke Co. v. McEnery, 1879, 91 Pa. 185, 191. There is nothing in the record to show that Dr. Kelly was licensed to practice medicine in Pennsylvania as required by the law of that State. 63 P.S.Pa. 401-415. Cf. the statement made by Dr. James B. Spradley, a witness for the plaintiff testifying on cross-examination that he assumed that Dr. Kelly was licensed to practice medicine in Pennsylvania. The record is silent as to the educational background of Dr. Kelly and the exact nature of his qualifications. In view of the presumption favored by the law of Pennsylvania that an independent contractor is presumed to have been selected with due care we find it unnecessary on the present record to discuss and issue relating to the qualifications or licensing of Dr. Kelly to practice medicine in Pennsylvania
 
 
 [11]
 Emphasis added
 
 
 [12]
 Emphasis added to the quotations from the release and the indemnification agreement
 
 
 [13]
 Webster's New International Dictionary, 2d edition, defines a patient as: 'sick person, now commonly, one under treatment or care, as by a physican or surgeon, or in a hospital; hence, a client of a physician, hospital, or the like.'
 
 
 [14]
 It is impossible to say from the exhibit whether the $10.00 fee was under the heading 'Shock Treatments' or under the heading 'Professional Fee' for the item $10.00 appears about equally between the two designations
 
 
 [15]
 Emphasis supplied