## Vendetti v. Shuster

*J. S. Jiuliante,* for plaintiff.
*John Gent,* for defendant.

LAUB, J., September 28, 1964.—Plaintiff, an armed services veteran, was operated on on May 7, 1958, while a patient in the United States Veterans Hospital in Erie. Defendant was the surgeon who performed the operation. This action was brought on the theory that defendant was negligent in performing the surgery and that, as a result, plaintiff suffered severe damage to the left knee. Defendant has moved for judgment on the pleadings, basing his right to judgment on the premise that, as a high-ranking officer of government, he is immune from suit with respect to matters occurring while in the course of his official duties.

Defendant's motion for judgment on the pleadings is with the papers but it appears that it has not been filed of record nor was a rule granted on it. However, by

stipulation on August 31, 1964, the parties declared that defendant served the motion on plaintiff; that defendant placed it on the January 1964 argument list and that at that time it was agreed that the motion would be filed with the judge appointed to hear arguments on it; that the motion was given to the writer of this opinion in chambers on January 29, 1964, and that arguments were heard at a pretrial conference on March 31st. And it was further stipulated that the parties waive any formal requirements of the issuance of a rule to show cause and that the matter shall proceed as if the motion for judgment on the pleadings had been filed of record on January 29, 1964, and that a rule to show cause had been granted on the same day.

On January 6, 1964, defendant presented a motion to dismiss the action. A rule to show cause was granted, returnable January 7, 1964, and the motion and rule were filed of record. But it appears that there has been no further action on this motion. Therefore, we will consider the motion to dismiss as having been merged into the motion for judgment on the pleadings, and we will make an order on the motion to dismiss the same as the order which will be made on the motion for judgment on the pleadings.

Since the sole point before us is the question whether defendant has an absolute immunity from suit, it is not necessary to recite the nature of the operation or plaintiff's complaints with respect thereto. It is necessary, however, to point out that defendant was a contract employe of the hospital, being designated in his contract as an attending orthopedic surgeon. The letter, which constituted the contract of defendant's employment, stipulated that he was to be compensated at a lump sum for each period of service, but this compensation was limited to a single payment on any one day regardless of the extent to which his services were used, His maximum compensation was set at $3,500 per

fiscal year and he was authorized to perform services only as required by his senior medical officer. From the pleadings, it appears that the particular service rendered plaintiff was authorized by, and in pursuance of, his contract, and was not a service independently contracted for by plaintiff by special arrangement with defendant.

Fortunately, a wealth of precedents relieves us of the necessity for weighing in the balance the conflicting arguments for and against the doctrine or rule of absolute immunity of public officers from suit for acts done in the course of their employment. The proponents of the privilege contend that, in the end, it is better to leave unredressed the wrongs done by officers having duties of grave importance to the public than to subject the officers to the constant dread of retaliation in the course of their employment.[1] It is their view that the shackles of fear might seriously interfere with an officer's discharge of his functions if he were open to suit because of official conduct, thus causing the public to suffer in the administration of its affairs by overcautious and timorous officials. In weighing the good of society against the occasional injustice which the doctrine fosters, these proponents feel that the rule must be maintained as one of those unfortunate incidents which often accompany the privilege of living in an organized, congregate community.

The opponents of the doctrine, on the other hand, see no societal necessity for its existence, believing that a public officer who departs from the norm in order to serve some purpose of his own, or becomes negligent in the performance of his duties toward others, should, at least, be required to face a jury on the question whether he was activated by malice or was guilty of some other gross impropriety. These opponents believe that the

---

[1] See Gregoire v. Biddle, 177 F. 2d 579, 581 (2d Cir.).

most a public officer is entitled to is a qualified privilege only.[2]

Whatever may be said of it, the fact at this level is that the doctrine exists in both Federal [3] and Pennsylvania law.[4] The problem before us is, therefore, whether defendant was a high-ranking public officer of government at the time of the operation, and whether, at that time, he was performing a purely public duty. If the answer to both these questions is in the affirmative, the doctrine immunizes him from this action.[5]

Prior decisions relieve us of the necessity for deciding the niceties of fact which distinguish an independent contractor from a servant, for whichever is the case, defendant must prevail if he falls within the class protected by the doctrine. With respect to defendant's status as a contract employe of the government, and with respect to whether the downward reach of the doctrine has extended below the presidential, cabinet, legislative and judicial levels, the protected areas originally encompassed by the rule, our task is simplified by the decisions in Gamage v. Peal, 217 F. Supp. 384 and Taylor v. Glotfelty, 201 F. 2d 51, in both of which it was held that the immunity protected contract psychiatrists employed in governmental installations. So, too, in Montgomery v. Philadelphia, 392 Pa. 178, 140 A. 2d 100, the doctrine was held applicable in Penn-

---

[2] See Mr. Justice Brennan's dissent to Barr v. Matteo, 360 U. S. 564, 79 S. Ct. 1347.

[3] Barr v. Matteo, supra; Gregoire v. Biddle, supra.

[4] Montgomery v. Philadelphia, 392 Pa. 178, 182-7, 140 A. 2d 100.

[5] The doctrine in cases of this nature should not, ordinarily, be fatal to a claimant veteran damaged by malpractice while in a Veterans Hospital. Suit could be brought against the United States under the Tort Claims Act (28 U.S.C.A. §2674) regardless of whether his original injury was service connected or was not service connected: United States v. Brown, 348 U. S. 110, 75 S. Ct. 141. It would appear that in this case the plaintiff allowed the statutory period to pass without instituting suit against the United States.

sylvania to such subordinate officials as the Deputy Commissioner of Public Property of Philadelphia and the city architect.

Having Gamage and Taylor in mind, it is easy to see that depending upon the nature of the act for which the immunity is claimed, the doctrine might, under some circumstances, apply to officers of the same character as defendant. However, it does not necessarily apply in all situations, and in the light of the hardship to an aggrieved plaintiff which the rule fosters, it ought not to be invoked except in clear cases. The determination whether an officer is entitled to the immunity's protection depends upon the nature of the duties performed by him, the importance of his office, and particularly whether or not he has policy-making functions: Montgomery v. Philadelphia, supra, p. 186. And, in this respect, it would seem that the term "policy-making" applies solely to the settled course or method to be adopted and followed by a branch or institution of government and not those incidental routines which accompany repeated action on the part of a mere employe in the course of performing his duties. Viewed in this light, the policy-making power of a Veterans Hospital with respect to medical matters is vested in the chief medical officer and not those individual practitioners of the healing art who are under his direction and control.

The difference in status between plaintiffs in Gamage and Taylor and plaintiff in this case seems marked. Neither Gamage nor Taylor were free agents capable of accepting or declining medical diagnosis and aid. Gamage was a flying officer on active duty with the Air Force when the acts were done which he contended entitled him to sue. Taylor, on the other hand, was a prisoner in a Federal institution when his alleged cause of action arose. In the operation of a military installation or a prison, the government, as one of its import-

ant functions, is vitally concerned with the health and mental capacities of those under supervision. Whether a soldier is to be retained on active or limited duty, or is to be discharged as unfit for service depends largely upon his physical and mental health; and the ultimate decision on these matters in which a medical specialist forms an important adjunct, is "policy-making" in the highest concept of the term. As pointed out in United States v. Brown, 348 U. S. 110, 112, 75 S. Ct. 141, 143, holding that the Federal Tort Claims Act is not available to servicemen injured in the course of service-connected activities while on active duty, "The peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty, led the Court [in Feres v. United States, 340 U. S. 135, 71 S. Ct. 153] to read that Act as excluding claims of that character." The force of this reasoning applies equally to suits against the individual components of government engaged in military pursuits, whether they are military or nonmilitary officers.

So, too, of prisoners in a public prison. Whether a prisoner is to be allowed the freedom of a congregate institution, whether he must be kept in close confinement, whether he is physically or mentally fit for assignment to rehabilitation projects within the institution, whether he is a safe risk for parole and whether he should be transferred to another, more specialized institution are matters in which the government has a great interest. Prisons, though hospitals for curing corruption, are essential adjuncts of any society having a lawless segment to deal with, and their medical officers, as in the case of military officials, perform highly important policy-making functions. Certainly, the

relationship between a contract psychiatrist and a prisoner in a Federal penitentiary, is not the same as the one which exists between a doctor and a voluntary patient in a hospital. In the latter instance, there is an element of volition resting with the patient; in the case of a prisoner or a soldier on active duty, volition is out of the question.[6] In the case of a soldier or a prisoner, the government has a direct and compelling interest in the mental and physical health of its wards in an area in which the government must function in self-protection. In a Veterans Hospital, while the government has a benign and humane interest in the health of the patients to whom its facilities are extended, such interest, while incidentally self-protective in attracting volunteers to the armed services, is overwhelmingly charitable in nature. "Charitable" is here used in its broadest sense of benevolence and not in the sense of assistance to the indigent. Thus, while the government as a patron is concerned with the health of its wards, the continued success of its hospitals does not, as in Gamage and Taylor, hinge upon forced medical diagnosis and treatment in the interest of society as a whole.

The operation of a government hospital is, of course, a governmental function. Post-service medical facilities

---

[6] Where a man is wounded in active service and can be restored to health so that he may return to his duties, it would seem that military doctors should have the unqualified right to force their ministrations upon him. An interesting legal question is raised, however, where the treatment will undoubtedly render the wounded man unfit for further military duty. The case of Robley D. Evans is in point. Evans, a young naval officer, was wounded in the assault upon Fort Fisher on January 15, 1864. A sniper's bullets struck both of his legs. Afterwards, when the doctors in the Naval Hospital at Norfolk attempted to cut off both his legs, Evans refused to allow it, using his pistols to enforce his will. Evans lived to return to active service and to write his memoirs. See Evans, "A Sailor's Log" (1901).

as well as financial bonuses and other benefits are vital. both in the attraction of civilians into volunteer service, as well as the assumption by government of the moral obligations to look after those formerly in the military, but this does not mean that the relationship between patients and their government is always, and under every circumstance, a relationship involving the pure exercise of a governmental function in the sense in which the immunity doctrine is applied. Obviously, where necessary, the immunity must be applied to the officers of hospitals as well as the other branches of public administration, but, where the immunity serves no logical purpose, it ought not to obtain.

Perhaps, in this area, the distinction between "medical acts" and "administrative acts" which applies to servants of a hospital as distinguished from surgeons in charge of an operating room, has more merit than some seem to think.[7] True, there is a hard problem of what constitutes one form of act or the other, but in distinguishing which services are protected by the immunity and which ones are not, such a distinction has its advantages. Certainly, the relationship between plaintiff and defendant did not involve the exercise of the purest form of governmental function. Much more than that was inherent in the circumstances. Plaintiff's acceptance of governmental bounty did not carry with it a waiver of all personal rights. He could, had he so chosen, have refused defendant's services and he could have declined the operation. The doctor-patient relationship does not depend upon the charitable nature of the arrangement between physician and patient. When one accepts the services of a physician, whether on a paid or charitable basis, there is an implied contract between the physician and the patient, and, in this State, if the

---

[7] See Brown v. Moore, 247 F. 2d 711, 715, citing and criticizing Benedict v. Bondi, 384 Pa. 574, 580-1, 122 A 2d 209.

doctor fails to afford proper treatment and care, a malpractice suit may be maintained.[8] The action, of course, is in tort for breach of the duty of care which the law imposes; it is not necessarily an action on the contract: Kozan v. Comstock, 270 F. 2d 839. This plaintiff was a third-party beneficiary to the contract between defendant and the hospital, and defendant's undertaking to operate on plaintiff was a matter which, notwithstanding the written agreement between defendant and the Veterans' Administration, was a purely personal matter between these parties. If there was an incidental governmental purpose to be served by the operation, it was overridden by the implied contract between the parties and the legal obligation thereby imposed.

We hold, therefore, that while the immunity from suit which protects high-ranking governmental officials may apply to a doctor in a Veterans Hospital insofar as administrative matters are concerned, as, for example, the determination whether a patient has an infectious or contagious disease and should be isolated, or whether a patient should be admitted or turned down, etc., it does not apply where the misconduct is charged to have been committed by a surgeon in the operating room. Conducting an operation is a pure medical act. In McConnell v. Williams, 361 Pa. 355, 362, 65 A. 2d 243, the "Captain of the ship" principle was enunciated, i.e., that the surgeon is in complete charge of those who are present and assisting him and that such supreme control is essential in view of the high degree of protection to which an anaesthetized, unconscious patient is entitled. If this is true, then defendant's judgment and conduct were not subject to control by anyone during the operation, including the medical officer in charge of the hospital. If an agent of

---

[8] See Brown v. Moore, supra, p. 716.

the government cannot direct how a surgeon is to operate once he enters the operating room, then the government itself cannot do so, for governments act only through agents. Thus, defendant in this operation was not acting as a high-ranking governmental official in the course of his public duties. He was acting in the capacity of a doctor tending his patient, and it is a matter of indifference who paid the bill or supplied the facilities for the operation; the requirement of due care was an obligation imposed on defendant by law.

And now, to wit, September 28, 1964, after argument and due consideration, defendant's motion for judgment on the pleadings is refused and dismissed; and the rule granted January 6, 1964, on defendant's motion to dismiss this action, is discharged and the motion is refused and dismissed.