395 F.2d 537
 Martha Cramer LEWIS, Guardian of the Person and Estate of Richard Paul Fields, a minor, and Dennis Fields and Joan Fields, husband and wife, Appellants,
v.
H. Leo OWEN, M.D., Appellee.
 No. 9541.
 United States Court of Appeals Tenth Circuit.
 January 15, 1968.
 Rehearing Denied February 21, 1968.
 
 COPYRIGHT MATERIAL OMITTED Richard G. Harris, of Harris, Graham & Harris, Bartlesville, Okl., and David H. Sanders, of Sanders, McElroy & Whitten, Tulsa, Okl., for appellants.
 John R. Richards and Dan A. Rogers, Tulsa, Okl. (Thomas W. Brown, Bartlesville, Okl., with them on the brief), for appellee.
 Before MURRAH, Chief Judge, PICKETT, Circuit Judge, and DELEHANT,* District Judge.
 PICKETT, Circuit Judge.
 
 
 1
 This action was brought by Martha Cramer Lewis, Guardian of Richard Fields, a five-year-old child, and Dennis Fields and Joan Fields, parents of the child, against H. Leo Owen, a physician in Bartlesville, Oklahoma, to recover damages alleged to have resulted from the failure to properly diagnose and treat the child for a disease which caused him to be mentally retarded. The complaint alleges causes of action for breach of contract and for negligence. The trial court treated the parents' action as one in tort, and held that their claim was barred by the Oklahoma two-year statute of limitations. 12 Okl. St.Ann. § 95. A jury found against the guardian, and judgment was entered accordingly.
 
 
 2
 The minor child, sometimes referred to as "Ricky" was born in the State of California on November 5, 1959. Sometime later the parents moved to Bartlesville, Oklahoma, where at the age of approximately two years, Ricky was taken to Dr. Owen, who was a practicing pediatrician in Bartlesville. On twenty different occasions between October 14, 1961 and May 15, 1963, Dr. Owen treated the child in his office for various illnesses common to children. During this period Ricky was regarded as slow mentally, but Dr. Owen did not make any tests to determine the cause of the mental condition. On July 30, 1963, Ricky was taken to another doctor in Bartlesville, and it was learned from a urinalysis that the child was afflicted with phenylketonuria, an inherited metabolic disorder usually resulting in mental retardation, commonly referred to by the medical profession as "PKU." The parties stipulated that the child had had PKU from the date of birth, and was mentally retarded at the time of the discovery of the disease. It was also stipulated that the disease of PKU is treatable if the treatment is administered early in the child's life, and the results of the treatment depend upon the individual case. The evidence is without conflict that when it was discovered that Ricky was afflicted with the disease, the brain damage was so advanced that the child was permanently mentally retarded and further treatment would not have been helpful. There was medical testimony that at the time of Ricky's birth there was in use an accepted dietary treatment which was then thought to be effective in arresting the progress of the disease in most cases, resulting in a reasonably normal life for the child if the treatments were maintained as prescribed. There was also testimony by knowledgeable experts that the more recent conclusions were that the claimed benefits of the dietary treatment were not proven and were questionable.
 
 
 3
 It was established that the medical profession in Bartlesville, while PKU was known to it in a general way, was not equipped to evaluate or treat the disease. Doctor Owen was not trained in the field of mental retardation and did not treat patients for the affliction. He testified that it was his practice to refer mentally retarded patients to the Oklahoma Medical Retardation Center in Tulsa because of the Center's special diagnostic facilities; that on a number of occasions he advised the Fields that Ricky was mentally retarded, and recommended that he be taken to the Oklahoma Center for an evaluation of the symptoms as to cause and possible recommendations for treatment.
 
 
 4
 The parents assert that the trial court erred in dismissing their claim (1) because it was a contract action, not tort; and (2) if in tort, two years had not elapsed between the date of the discovery of their legal rights and the commencement of this action. The record discloses that the gravamen of the parents' action consists of alleged negligent and careless acts of a practicing physician and, in substance, is an action for malpractice. There are no allegations of a warranty to cure the disease. The Oklahoma law is that such actions are considered to be in tort and subject to the two-year statute of limitations. In Seanor v. Browne, 154 Okl. 222, 7 P.2d 627, 630, the court said:
 
 
 5
 "We are of the opinion that an action for malpractice for negligence, carelessness, and unskillfulness of a physician, in treating a patient, though based upon a contract of employment, is an action in tort, and governed by the two-year statute of limitations, as the contract of employment is merely the inducement and right of the physician to treat the patient."
 
 
 6
 See also, Yoshizaki v. Hilo Hospital, (Haw.) 427 P.2d 845; Billings v. Sisters of Mercy, 86 Idaho 485, 389 P.2d 224; Ericson v. Charles, 108 Kan. 205, 195 P. 652; Kozan v. Comstock, 5 Cir., 270 F.2d 839, 80 A.L.R.2d 310, Anno. 320; Merchants Nat'l Bank v. Morriss, 1 Cir., 269 F.2d 363; Brown v. Moore, 3 Cir., 247 F.2d 711, 69 A.L.R.2d 288, cert. denied 355 U.S. 882, 78 S.Ct. 148, 2 L.Ed.2d 112.
 
 
 7
 The Oklahoma courts accept the rule that the limitation period in malpractice actions does not begin to run until the patient learns, or in the exercise of reasonable care and diligence should have learned, of the negligent acts of the physician. Seitz v. Jones, (Okl.) 370 P.2d 300. On July 30, 1963 Ricky was taken to Doctor William H. Dougherty, Jr., a pediatrician at Bartlesville, Oklahoma, for examination. At that time he was obviously mentally retarded and Dr. Dougherty, after examination and tests, advised the parents that Ricky was afflicted with PKU. On August 28, 1963 the parents took Ricky to the Childrens' Medical Center in Tulsa, where he was examined by Doctor Coldwell. The diagnosis of PKU was confirmed, and the parents were told that as a result of the disease Ricky was severely mentally retarded and could not be cured. Ricky remained in the Tulsa hospital for a period of time while the parents were trained to administer a prescribed diet. The action of the parents was filed on October 8, 1965, more than two years after they learned that their child would be permanently mentally retarded. We agree with the trial court that not later than August 28, 1963 they were put on notice of any claim which they might have had against Dr. Owens for negligent and careless acts, and under the Oklahoma statute of limitations were chargeable with inexcusable neglect in the assertion of their rights.
 
 
 8
 Before the introduction of any evidence, the plaintiffs invoked the rule excluding witnesses from the court room. Dr. Richard Koch of Los Angeles, California, an experienced pediatrician and recognized expert in the field of mental retardation, was called by appellants to testify as an expert witness. At the request of counsel for Dr. Owen, one of his expert witnesses in the same field, Dr. Bessman, was permitted, over the objection of appellants, to remain in the court room for the purpose of assisting counsel during Dr. Koch's testimony. It is now asserted that this was prejudicial error because counsel for Dr. Owen knew that Dr. Koch would not later be available as a witness; and that thereafter Dr. Bessman was used for the purpose of impeaching Dr. Koch, and made a personal attack upon him. The general rule is that, notwithstanding a court order excluding witnesses from the court room during the presentation of evidence, it is within the sound discretion of the court to permit an expert witness to remain in the court room while other witnesses are testifying, and the court's action is reviewable only for abuse of discretion and prejudice to the complaining party. 88 C.J.S. Trial §§ 65-67; Elizabeth River Tunnel Dist. v. Beecher, 202 Va. 452, 117 S.E.2d 685; 85 A.L.R.2d 469, Anno. 478. This rule is recognized by the Oklahoma courts. Sharp v. Pawhuska Ice Co., 90 Okl. 211, 217 P. 214; Oskison v. Bagby, 172 Okl. 569, 46 P.2d 331. The testimony of Dr. Bessman does not disclose any prejudicial unfair advantage to the appellee because he was permitted to hear the evidence given by Dr. Koch, nor does it disclose that a prejudicial attack was made upon Dr. Koch. It is true that the medical views of Dr. Bessman and also Dr. Allen regarding effective treatment of PKU were in direct conflict with those expressed by Dr. Koch. The weight to be given to the testimony of these acknowledged experts was for the jury to decide. Dr. Koch had published numerous articles concerning treatment of PKU. Some of these publications were reviewed by Dr. Bessman and inconsistencies were referred to. Some of his testimony was for the purpose of impeachment. The credibility of any witness is always subject to attack on cross-examination by showing prior inconsistent statement or by impeachment. Creekmore v. Crossno, 10 Cir., 259 F.2d 697; Wininger v. Day, Okl., 376 P.2d 206. The extent and scope of the cross-examination of a witness and of impeachment evidence in respect to an appropriate subject rests, to a large extent, within the sound discretion of the trial court. Kanatser v. Chrysler Corp., 10 Cir., 199 F.2d 610, cert. denied 344 U.S. 921, 73 S.Ct. 388, 97 L.Ed. 710. See also, Dist. of Columbia v. Clawans, 300 U.S. 617, 57 S.Ct. 660, 81 L.Ed. 843; Summit Drilling Co. v. C.I.R., 160 F.2d 703. We conclude that permitting Dr. Bessman to remain in the court room during the testimony of Dr. Koch was not an abuse of the court's discretion, and the testimony which he gave thereafter was not prejudicial error.
 
 
 9
 It is next asserted that the trial court required the liability of Dr. Owen to be determined by the generally accepted and recognized method of diagnosis and treatment of PKU during the treatment period of October 4, 1961 to May 15, 1963, while permitting the defense to show by testimony of experts that due to research and knowledge developed subsequent to May 15, 1963, they were of the opinion that the dietary treatment was not effective as a treatment of the disease, thereby applying a prejudicial double standard of proof. It is argued that the duties and liabilities are to be determined by conditions as of the date of injury, and a proof of change in conditions subsequent to the injury is inadmissible, citing Heilig v. Studebaker Corp., 10 Cir., 347 F.2d 686, and like cases. The fallacy of this argument is that there was no change in actual conditions upon which liability could be premised. The conflict in the testimony of the experts was whether the dietary treatment of PKU patients was effective or helpful during the period when Dr. Owen was treating Ricky or at any other time. Dr. Koch stoutly defended the dietary treatment as an effective remedy not only during the period of treatment, but also at the time of trial.[1] The testimony of other experts was that as a result of additional research and knowledge they had changed their opinions and did not now agree with Dr. Koch. They believed that had Dr. Owen so treated Ricky he would not have been cured and the effects of the disease would not have been reduced. If the appellant's argument were sound, a practicing physician who failed to prescribe a remedy which at the time was believed by the profession to be proper, would be liable even though subsequently it were determined that such treatment, if followed, would have actually been detrimental to the patient. The purpose of the testimony of Dr. Owen's experts in the field was not to establish such a standard of care, but to show that the failure to diagnose and prescribe the dietary treatment was not the proximate cause of the injury and was admissible for that purpose. This was the issue which went to the jury. The court advised the jury that one theory of defense was that "had the condition been diagnosed during the time he was being treated by Dr. Owen, there was no known effective treatment at that time, or now, which would have cured or lessened the effects of the disease."
 
 
 10
 After fully instructing the jury on the duty and responsibility of a practicing physician to his patients, and the liability for negligent, careless, and unskillful conduct, over the objection of the appellants the court gave this instruction:
 
 
 11
 "You are instructed that the law presumes that the defendant, according to medical standards, possesses reasonable knowledge and skill, and that in the service undertaken and rendered by him, he discharge his full legal duty to his patient, including the exercise of reasonable care, prudence, diligence and foresight in the application of his skill and learning. This presumption is, however, a disputable presumption which may be overcome by evidence reasonably justifying a contrary conclusion. The presumption continued, however, throughout the trial, unless and until overcome by contrary evidence."
 
 
 12
 While we find no need for the application of the legal presumption in a case of this kind, it appears that the instruction is no more than a reference to the requirement that the plaintiff is required to affirmatively prove the negligent acts of the doctor before there can be a recovery. Elsewhere the jury was told that the burden was upon the plaintiffs to prove the negligent and careless acts of Dr. Owen by a preponderance of the evidence. Reviewing the instructions as a whole, which we are required to do, Krieger v. Bausch, 10 Cir., 377 F.2d 398; Connecticut Fire Ins. Co. v. Fox, 10 Cir., 361 F.2d 1; Riley v. Layton, 10 Cir., 329 F.2d 53, we find no prejudicial error in the foregoing instruction.
 
 
 13
 There is no merit in appellants' contention that there was error in the court's refusal to give instructions incorporating provisions of the Oklahoma "Basic Science Act, 1937", 59 Okl.St.Ann. §§ 701-724, and the 1947 Act, that prohibit unqualified persons from holding themselves out as qualified to diagnose and treat human ailments and from using the title "doctor." 59 Okl.St.Ann. §§ 731.1-731.6. These statutory provisions, which have no application here, were enacted for the purpose of protecting the public from the fraudulent use of the title "doctor" and from diagnosis and treatment of human illnesses by persons who had not been duly licensed under the laws of Oklahoma. An examination of the voluminous record in this case shows that the case was tried carefully, with due consideration for the rights of all the parties and without prejudicial error.
 
 
 14
 Affirmed.
 
 
 
 Notes:
 
 
 *
 Senior District Judge of the Eighth Circuit, sitting by designation
 
 
 [1]
 Dr. Koch testified:
 "In my opinion, the diet is still the basic and only form of treatment for phenylketonuric patients so diagnosed."