Frank L. GOUIN, Phyllis G. Kelly, Arthur E. Ritch, Jr., as Successor in Interest to Gayle G. Ritch, Deceased, and June G. Wood, Plaintiffs-Appellees and Cross-Appellants,

v.

CONTINENTAL OIL COMPANY, Skelly Oil Company, and the Loco Unit, Defendants-Appellants and Cross-Appellees.

No. 49993.

Court of Appeals of Oklahoma, Division No. 2.

Oct. 31, 1978.

Rehearing Denied Nov. 20, 1978.

Released for Publication by Order of Court of Appeals Feb. 8, 1979.

O. L. Peck, Jr., and George D. Sherrill, Jr., DeBois, Peck & Sherrill, Duncan, for plaintiffs-appellees and cross-appellants.

Paul D. Sullivan, Leach, Sullivan, Sullivan & Green, Duncan, John Wimbish, Continental Oil Co., Houston, Tex., for defendants-appellants and cross-appellees.

BRIGHTMIRE, Judge.

Both of the oil producing adversaries appeal—plaintiffs from an order granting a new trial, defendants from a denial of their motion for judgment notwithstanding a verdict which found them guilty of ineptly causing $141,120 in damages to certain oil bearing sands underlying plaintiffs' adjoining lease.

### I

Plaintiffs hold a mineral lease on a 40-acre tract in Stephens County, Oklahoma, known as the W. Y. Dilley Lease. Adjacent to it is a 2,300-acre secondary oil recovery project on land leased by defendants, Continental Oil Company and Skelly Oil Company, for oil and gas exploration purposes and unitized by order of the Oklahoma Corporation Commission. Named the Loco Unit, a corporate entity was created in 1961 to conduct the large waterflood operation.

In 1964 Continental, as operator of the unit, began the third phase of the project by injecting water into the Loco Sand Zone at the rate of 7,000 barrels daily for about two weeks via an offsetting well proximal to several Dilley producers. This rate, according to plaintiffs' evidence, was excessive resulting in damage to the Loco formation underlying plaintiffs' lease.

Shortly after the third phase began, plaintiffs decided their wells were being adversely affected and in September 1966 plaintiff Gouin wrote Continental complaining of substantial loss of production caused, he said, by an excessive rate of water injunction in nearby wells coupled with a low viscosity of crude in the Loco Strata. And the writer added this—"[a]t first I thought the damage was only temporary but now I find that it is permanent."

Despite plaintiffs' plea, however, defendants continued right on doing their thing thus creating a foundation for plaintiffs' claim that defendants did so recklessly, wantonly, and in complete disregard of plaintiffs' rights.

It was not until september 10, 1970 that plaintiffs filed this lawsuit seeking recovery for detriment they say they suffered as a result of defendants' tortious conduct—detriment estimated to be $242,000, the then market value of around 100,000 barrels of oil displaced and rendered unrecoverable. Plaintiffs also asked $50,000 for punitive damages.

In their answer defendants admitted injecting water in several well locations offsetting those owned by plaintiffs and conceded that plaintiffs had asked them to either stop it or reduce the rate of water injection. They insisted, however, that their waterflooding activity was beneficial rather than detrimental to plaintiffs' wells. Alternatively, defendants alleged that if indeed they had damaged plaintiffs' wells they had done so long before September 10, 1968, and as a result plaintiffs' action was barred by the two-year statute of limitations for bringing the tort action.

In a reply plaintiffs pleaded that defendants were estopped to assert the statute of limitations because their conduct induced plaintiffs to postpone institution of this action.

### II

Trial of this action began November 14, 1974—some four years and two months after it was filed. Considerable technical

data which had been accumulated over the intervening years was presented. Experts, including plaintiff Gouin, himself a geologist, explained and evaluated the available information and then reached differing conclusions. The jury was eventually allowed to ponder the factual discrepancies. After about an hour and a half of deliberation, one of the jurors discovered a folder full of papers which was not marked as an exhibit. He notified the bailiff who in turn passed the revelation on to the judge. Disturbed by the development, the judge summoned the lawyers for a conference. After the conferees had discussed the matter for about an hour and a half, the jury advised the bailiff it had reached a verdict. At this point, the parties "agreed and stipulated that the Court should go in and receive and accept the verdict, if in proper form, after which, if it be a verdict for the plaintiffs, the Court will make inquiry as to the nature and extent of the contamination, if any, which counsel's personal file (the non-exhibit referred to as the Court's Exhibit No. 1) had upon the jury and the extent they examined those files."

The clerk read the verdict. It was unanimous and awarded plaintiff $141,120. The court then carried out an extensive interrogation of the jury and discovered that only one juror had read any of the contents of the Court's Exhibit No. 1 and it was his thought that he had received no information that was not in evidence. The trial court accepted the verdict, discharged the jury, and rendered judgment accordingly. Defendant, who earlier had moved for a directed verdict, moved for judgment notwithstanding the verdict and in the alternative for a new trial. The first motion was overruled, but a new trial was granted on the sole ground that unauthorized material inadvertently found its way into the jury room and deprived defendants of a fair and impartial trial.

Defendants perfected an appeal from the order overruling their post verdict motion for judgment and plaintiffs cross-appealed the order granting a new trial.

## III

Perhaps the best approach to this review is to first resolve the issue raised by appellants that they are entitled to a judgment notwithstanding the verdict. And then, if we find they are, the question presented by cross-appellants as to whether the trial court erred in granting a new trial becomes academic.

Defendants say they are entitled to judgment regardless of the verdict because (1) "plaintiffs completely failed to prove damages," and (2) plaintiffs' action is barred by the statute of limitations.

■ The first reason is without merit. There was sufficient evidence of permanent damage to sustain the verdict. Expert witnesses' assessments of the effect of defendants' waterflooding efforts on plaintiffs' wells ranged from an economic gain of around $96,000 to a loss of $224,000. Plaintiff Gouin, for example, testified that subterranean migration of water damaged the Loco Zone within the bounds of his lease and resulted in 100,000 barrels of oil worth $200,000 becoming irretrievable. Another expert, a petroleum engineer, opined that excessive water injection—both as to quantity and rate—caused channeling and premature water breakthrough in plaintiffs' Loco Sands resulting in the destruction of all secondary recovery reserves which he calculated to be at least 84,000 barrels having a total value of about $224,400.

■ If evidence is adduced showing a causal connection between the wrong complained of and an injury, then recovery will not be denied merely because there is uncertainty in the proof as to the measure or extent of the damages. *Oklahoma Transp. Co. v. Hays*, Okl., 405 P.2d 181 (1965); *George v. Greer*, 207 Okl. 494, 250 P.2d 858 (1942).

Defendants' second reason for insisting on a judgment presents a more troublesome question and is that more than two years elapsed after Gouin admitted it was apparent to him that plaintiffs' oil production had been permanently impaired. Reliance is mainly on two letters written by Gouin to

Continental—one in 1966 referring to damage sustained in 1964 which he said he found to be permanent and the other in 1968 advising that he had acquired proof to support his earlier finding of permanent damage to plaintiffs' wells. This evidence, argues defendants, is of such a nature that reasonable minds cannot reach any conclusion other than it was apparent to Gouin by September 1, 1968 that permanent damage had been done to plaintiffs' oil producing property and that his awareness started the two year limitations period running.

## IV

■ As both parties point out, we are dealing not with a temporary loss but with permanent damage to real property; and the relevant law is that the statutory limitations period does not begin to run against a cause of action for such detriment until the permanency of the damage done becomes "apparent" to the damagee. *Continental Oil Co. v. Williams*, 207 Okl. 501, 250 P.2d 439 (1952). The term "apparent" in the sense used in *Continental* means "visible, . . . readily understood, obvious, clear, [or] evident"[1] to a degree sufficient to warrant the institution of an action for remedial relief.

■ We hold that the evidence as a matter of law compels the conclusion that it was apparent to plaintiffs that they probably had a provable cause of action for permanent injury damages against defendants at least by September 1, 1968. In his September 1966 letter Gouin's main objective as stated in the first paragraph was to have "Continental Oil Company discontinue injecting water into the lower Loco [Z]one . . . .." At trial the correspondent said that though he stated at that time (1966) that he found the water flooding had caused permanent damage to plaintiffs' reservoir, the assertion was based only upon a feeling he had, and as he explained, "I hadn't proved it." Up until this point in time we think it cannot be said as a matter of law that permanent subterranean damage from the 1964 flooding was apparent or evident to plaintiffs.

Between 1966 and September 1, 1968, however, considerable testing of plaintiffs' wells was carried out, and by the latter date Gouin had acquired additional information he mentioned when he again wrote Continental on September 10, 1968 saying he felt he had done "everything possible" to test plaintiffs' wells and that the "tests prove the damage done to this reservoir by the rapid disposal of several thousand barrels of water in the Conoco-Dilley-Schram # 4 [offset well] and by the excessive rate of injection in the other injection wells in this area." In other words, Gouin was explaining that permanent damage to plaintiffs' reservoir had become apparent or evident to him as a result of the acquisition of proof sufficient to sustain a cause of action for its recovery. Gouin consequently tailed off his letter with this advice: "We are now ready for the Continental Oil Company to make arrangements to pay for the damage . . .." The tests referred to were completed by August 31, 1968, and it was the results achieved from them that Gouin characterized as proof that the 1964 flooding by defendants and permanently damaged plaintiffs' hydrocarbon supply.

Plaintiffs take the position, however, that the two-year statute of limitations did not start to run until September 10, 1968, the date they wrote the letter to Continental, and that therefore, the filing of this lawsuit on September 10, 1970 was in time. The trouble with this position is that the writing of the letter could in no way help make the permanency of the damage apparent to plaintiffs and, therefore, the act could not have triggered commencement of the limitations period. What tripped the limitation switch was the information gleaned 10 days or more earlier. There is no evidence that plaintiffs obtained any additional information with regard to the nature of their damage between August 31 and September 10, 1968. Under these circumstances, there is no rational basis for finding that subject damage was any more apparent or evident

1. Webster's New Twentieth Century Unabridged Dictionary 88 (2nd ed. 1964).

to Gouin on September 10, 1968 than it was nine days earlier. We cannot escape the conclusion, therefore, that the two-year statutory period began to run at least by September 1, 1968 and, of course, expired as a matter of law September 1, 1970—nine days before this lawsuit was filed.

## V

The foregoing would dispose of the appeal were it not for the fact that plaintiffs pleaded and the jury was permitted to find that defendants were estopped by their conduct to invoke the statute of limitations. Defendants contend there is no evidence to support plaintiffs' estoppel theory and we have to agree. We find nothing in the record to suggest that defendants directly or indirectly requested or by words or conduct induced plaintiffs to delay filing this lawsuit for even a day.

The judgment appealed is therefore reversed and the cause remanded with directions to grant defendants' request for judgment notwithstanding the verdict and to enter judgment accordingly.

NEPTUNE, P. J., and BACON, J., concur.