**Dorothy WILLIAMS, Plaintiff–Appellant,**

v.

**BORDEN, INC., and Goodyear Tire and Rubber Company, Inc., Defendants–Appellees.**

No. 77–2109.

United States Court of Appeals, Tenth Circuit.

Nov. 28, 1980.

Rehearing Denied Feb. 10, 1981.

Robert K. McCune, Oklahoma City, Okl. (Gene Stipe, of Stipe, Gossett, Stipe & Harper, Oklahoma City, Okl., was with him on the brief), for plaintiff–appellant.

Larry D. Ottaway, Oklahoma City, Okl. (Elliott C. Fenton of Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, Okl., was with him on the brief), for defendant–appellee, Borden, Inc.

John T. Edwards, Oklahoma City, Okl. (Monnet, Hayes, Bullis, Thompson & Edwards, Oklahoma City, Okl., was with him on the brief), for defendant–appellee, Goodyear Tire and Rubber Co., Inc.

Before HOLLOWAY and McWILLIAMS, Circuit Judges, and MILLER, Judge.*

* Honorable Jack Richard Miller, United States Court of Customs and Patent Appeals, sitting by designation.

HOLLOWAY, Circuit Judge.

Plaintiff Dorothy Williams appeals from a summary judgment for defendants Borden, Inc. (Borden), and Goodyear Tire and Rubber Company, Inc. (Goodyear). Her complaint in this diversity action alleged claims in manufacturer's products liability and negligence. The substance of these claims was that defendants each manufactured a clear plastic film used in meat wrapping, which film was coated with polyvinyl chloride (PVC);[1] that when the film was cut in the meat wrapping process through the use of a heated wire, the PVC decomposed into fumes containing toxic substances; that when plaintiff was working as a meat wrapper she breathed these fumes in her work; and that the fumes caused what has come to be known as "meat wrappers' syndrome," a chronic obstructive pulmonary disease of an asthmatic nature, producing permanent disability.

■ The district court granted defendants' summary judgment motions and dismissed the action as time–barred by the Oklahoma two–year statute of limitations provided in 12 O.S. § 95 (Third) (1971).[2] More specifically, the court concluded that all five separate times from which accrual of the cause of action might be measured occurred more than two years prior to the commencement of the action; that there was no concealment which would toll the statute; and that therefore, under any theory recognized by the courts of Oklahoma as to the time of accrual, the action was barred. (I R. 334–36).[3]

On appeal, plaintiff argues that the proper time of accrual of her claim was when she first received "competent medical advice that her condition was *probably* caused by the PVC fumes . . .." (Brief of Appellant at 5; emphasis in original); that the district court erred in finding that such competent medical advice was received by plaintiff more than two years before commencement of her action on July 11, 1975; and that such advice could not have been before a November 5, 1973, article in the Journal of the American Medical Association, first recognizing the "meat wrapper's asthma" disease. (Reply Brief of Appellant at 5). She says that no earlier accrual could have occurred in March or April 1973, because statements then made would have been inadequate medical proof so that the test of

1. Defendant Borden's product was denominated Resinite, RMF–61, while defendant Goodyear's product was called Prime Wrap.

2. 12 O.S. § 95 (1971) provides in pertinent part:
   Civil actions other than for the recovery of real property can only be brought within the following periods, after the cause of action shall have accrued, and not afterwards: . . .
   Third. Within two (2) years: an action for trespass upon real property; an action for taking, detaining or injuring personal property, including actions for the specific recovery of personal property; an action for injury to the rights of another, not arising on contract, and not hereinafter enumerated; an action for relief on the ground of fraud–the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud.
   This two–year limitation applies to actions sounding either in negligence or in manufacturer's products liability. *See Kirkland v. General Motors Corporation,* 521 P.2d 1353, 1361 (Okl. 1974).
   Many of the activities premising plaintiff's action herein occurred while she was working in California. Oklahoma's borrowing statute, 12 O.S. § 105, permits a plaintiff in such circumstances to employ either the Oklahoma limitation statute or that of the other involved state, whichever is longer. California allows only one (1) year for products liability and negligence actions. *See California Civil Procedure Code* § 340 (West 1954 & Supp. 1979). Thus, the Oklahoma period governs in this case.

3. In Oklahoma a statute of limitations begins to run when plaintiff might first prosecute her action to a successful conclusion. *See Oklahoma Brick Corporation v. McCall,* 497 P.2d 215, 217 (Okl.); *Moore v. Delivery Services, Inc.,* 618 P.2d 408 (Okl.Ct.App.). The district court listed the following times as points from which to measure the limitation period:
   (a) plaintiff's first exposure to PVC fumes;
   (b) plaintiff's last exposure to PVC fumes;
   (c) the onset of plaintiff's illness;
   (d) the diagnosis of plaintiff's condition as asthmatic; and
   (e) plaintiff's first competent medical advice her condition could have been caused by fumes from PVC. (I R. 335).
   As noted, the court concluded that each of these times occurred more than two years before plaintiff filed her complaint on July 11, 1975. (*Id.* at 335).

having a claim on which she could have successfully concluded an action would not have been met. (Brief of Appellant at 14–15).

Union newsletters were received by plaintiff following the November 1973 A.M.A. article. It was not until she found out about the causal relation of the product to the disease in these 1975 newsletters that her cause of action accrued. (*Id.* at 16). Finally, plaintiff contends that "concealment may be present in the instant case from failure to warn of a potential hazard of foreseeable danger associated with the use of the meat wrapping film manufactured by Defendants." (Brief of Appellant at 17). She says that the district court erred in ruling that there was no concealment which would toll the statute of limitations.

We first consider what is the proper test to apply on accrual of such a cause of action under Oklahoma law.

## I

■ As a general rule, mere ignorance of the existence of a cause of action or the facts constituting a cause of action on the part of the plaintiff will not toll the running of limitations. *Knudson v. Weeks,* 394 F.Supp. 963, 971 (W.D.Okl.); *Moore v. Delivery Service, Inc.,* 618 P.2d 408 (Okl.Ct. Civ.App.). However, special rules apply in cases involving particular hardship or other circumstances justifying different accrual rules. For example, the Oklahoma Supreme Court has ruled that the limitation period does not begin to run in a malpractice action where a foreign object was left in a patient's body until the patient learns, or in the exercise of reasonable care and diligence should have learned, of the presence of the object. *See Seitz v. Jones,* 370 P.2d 300 (Okl.); *and see Lewis v. Owen,* 395 F.2d 537, 540 (10th Cir.). Again, in an action for the cumulative damages resulting

from pollution of a stream it was held to be fundamental that the statute did not run until the damage was apparent from the dying of trees and the failure of crops to mature. *Continental Oil Co. v. Williams,* 250 P.2d 439, 441 (Okl.). In an action for damage from a water flood operation by oil producers it was held that the limitation period did not commence until the permanency of the damage becomes apparent to the injured party. *Gouin v. Continental Oil Co.,* 590 P.2d 704, 707 (Okl.Ct.Civ.App.).

We find no clear Oklahoma decision as to whether some such special accrual rule would apply in the case of an occupational injury from the cumulative effect of an allegedly harmful product. Hence we must decide what the Oklahoma courts would probably do in such a case. *Ricciuti v. Voltarc Tubes, Inc.,* 277 F.2d 809, 812 (2d Cir.). The district judge's order and his subsequent memorandum of findings and conclusions did not express his views on the applicable rule in Oklahoma or cite authority for his conclusions. (See I. R. 331, 334–35).[4]

■ We are persuaded that the indications from these Oklahoma cases point to the probable application of a rule that such a claim for personal injury from an occupational disease allegedly produced by the cumulative effect of a dangerous product does not accrue "until the plaintiff knows, or as a reasonably prudent person should know, that he has the condition for which his action is brought and that defendant has caused it." *Schiele v. Hobart Corp.,* 284 Or. 483, 587 P.2d 1010, 1013 (Or.). The Oregon Supreme Court there applied such an accrual rule in a persuasive opinion in a similar case of injury to a meat wrapper, allegedly due to fumes from polyvinyl chloride meat wrapping film. We feel that such a rule as was applied in the *Schiele* case is in accord with the limitations rules on the awareness of claims in the Oklahoma cases we have mentioned. It also accords with the reme-

---

4. We are mindful of the rule that the views of a resident federal judge on the unsettled law of his state are persuasive and ordinarily accepted. *Sade v. Northern Natural Gas Co.,* 501 F.2d 1003 (10th Cir.). However, as we have explained, the district judge based the summary judgment on the conclusion that under any of five different theories of accrual, the instant action is barred. See note 3, *supra.*

dial purpose evident in Oklahoma decisions with respect to products liability cases. *See, e.g., Moss v. Polyco, Inc.*, 522 P.2d 622, 625–26 (Okl.); *Kirkland v. General Motors Corp.*, 521 P.2d 1353, 1356, 1360–61 (Okl.).[5]

■ We are, of course, first and mainly guided by the principles from the Oklahoma cases. However, in deciding what the Oklahoma courts would probably do we are justified in examining decisions from other jurisdictions. *Ricciuti v. Voltarc Tubes, Inc.*, 277 F.2d 809, 812 (2d Cir.). The Oregon decision in the *Schiele* case is most persuasive because it involved a similar claim of injury from the effect on a meat wrapper of PVC fumes. The Oregon Court reversed a summary judgment based on limitations because the record did not demonstrate any prevalent knowledge of the dangers of fumes from polyvinyl chloride; it could not be said as a matter of law that "... a reasonably prudent person would have apprehended more than two years prior to the commencement of plaintiff's action that she was being seriously or permanently injured." 587 P.2d at 1014.[6] The court did not agree with the position that a positive diagnosis must exist to start the period running, but stated (587 P.2d at 1014):

> On the other hand, we reject defendants' claim that knowledge of symptoms

and their causal relationship to defendants' actions in and of itself initiates the running of the statute. We do not believe the legislature intended that the statute be applied in a manner which would require one to file an action for temporary sickness or discomfort or risk the loss of a right of action for permanent injury.

The statute of limitations begins to run when a reasonably prudent person associates his symptoms with a serious or permanent condition and at the same time perceives the role which the defendant has played in inducing that condition.

■ We are persuaded that a similar rule on accrual would be applied by the Oklahoma courts in a case like this, namely, that the statute of limitations for such a claim does not begin to run until the plaintiff knows, or as a reasonably prudent person should know, that he has the condition for which his action is brought and that the defendant caused it.[7] We must now consider whether the summary judgment granted here was proper under such a standard on accrual.

## II

Many of the significant facts appear in the deposition of plaintiff Williams. She

5. In reaching this conclusion we are also persuaded by *Munsingwear, Inc. v. Tullis*, 557 P.2d 899 (Okl.), a case involving application of the discovery rule in the context of the one–year workers' compensation limitation period of 85 O.S. § 43. In holding the action barred, the Oklahoma Court stated (*id.* at 903):

Under the circumstances of a cumulative effect accident, the accidental injury, which accompanies the accident, occurs (1) at the time of claimant's awareness, or discovery, of a "defect" or "ill effect" caused to the claimant; and (2) at the time of his awareness that the effect is causally connected with his job. It is then, the limitation period of one year begins to run under § 43, supra.

6. The *Schiele* complaint was filed on March 8, 1976. Plaintiff Williams filed her complaint in the instant case on July 11, 1975.

7. *See also Ricciuti v. Voltarc Tubes*, 277 F.2d 809 (2d Cir.); *Raymond v. Eli Lilly & Co.*, 412 F.Supp. 1392 (E.D.N.H.), *aff'd*, 556 F.2d 628 (1st Cir.); *Louisville Trust Co. v. Johns–Manville Products Corp.*, 580 S.W.2d 497 (Ky.);

*Colvin v. FMC Corp.*, 604 P.2d 157 (Or.Ct.App.); *Nolan v. Johns–Manville Asbestos & Magnesia*, 74 Ill.App.3d 778, 30 Ill.Dec. 307, 392 N.E.2d 1352 (Ill.App.Ct.); *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir.), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107; *Karjala v. Johns–Manville Products Corp.*, 523 F.2d 155 (8th Cir.). *Cf. Urie v. Thompson*, 337 U.S. 163, 168–71, 69 S.Ct. 1018, 1023–25, 93 L.Ed. 1282 (discovery rule applied to silicosis claim under Federal Employers' Liability Act); *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657 (3d Cir.) (discovery rule applied to action for bodily injury from birth control pills); *Wetzel v. McDonnell Douglas Corp.*, 491 F.Supp. 1288, 1291–93 (E.D.Pa.).

We have noted the opinion in *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259, a malpractice case under the Federal Tort Claims Act, but are not persuaded that it indicates that a different accrual standard should be applied in this products liability case.

testified there concerning her work as a meat wrapper in various supermarkets in Oklahoma and California from January 1950 until July 1972. In the spring of 1972 she had begun to cough a bit. Her eyes watered, her nose ran, and she had difficulty breathing. (III R. 38–40). On July 10, 1972, she quit work after she had tried to work but became too ill to continue. (*Id.* at 41). She was hospitalized in California in November 1972 after complaining that she was unable to breathe. Following eight days of hospitalization the doctor told her to return to work.

In January 1973 she contacted a California lung specialist, Dr. Scholdager. He diagnosed her condition as "acute spasmatic bronchial asthma." (*Id.* at 43–44). She then began thinking that the difficulty might have been caused by her working conditions and discussed this with Dr. Scholdager. The doctor said that she had been working so long as a meat wrapper that he doubted that her illness was caused by the working conditions. (*Id.* at 44). At about this time she tried to work again at some stores in California but noticed that she could not breathe when she was working and had to leave work early. When she returned to Dr. Scholdager she mentioned this and he said "well it could be because of inhaling the smoke." (*Id.* at 45).[8] This was in March or April 1973.

In detailing her 1973 discussions with Dr. Scholdager plaintiff Williams stated further (*id* at 69):

A. I believe I asked him on my first or second visit with him which was in January, and he said no, but then later on I asked him, I said, Dr. Scholdager, are you sure? Shouldn't we check into it and see if this could be because I am getting no better. I just got worse. And he said it could be, it was a possibility. So then later on he told me he had gotten word, he didn't tell me where or anything, he said I've gotten word–I've heard that it could possibly be because I heard of other meat employees having the same trouble.

Q. And was that your March conversation?

A. Yes.

Later plaintiff said she had thought of the possibility of the cause herself, that it was in the back of her mind because smoke would come up in her face, that she would see it on her hair, and that the shampoo from her hair was brown. (*Id.* at 75). She described Dr. Scholdager's reaction to her questions about the cause as follows (*id.* at 75):

. . . And then during–sometime during the mean time he said that he had read somewhere or heard, and he didn't tell me where. But he said it could possibly be caused by that because I have heard it.

Mrs. Williams testified that she had no information of a definite link between the polyvinyl chloride fumes and her disease until she began to get bulletins from her Union in July, August and September, 1975. (*Id.* at 69–70, 75–76). In addition, plaintiff Williams attached to her answer to defendants' interrogatories the November 5, 1973, article from the Journal of the American Medical Association. (III R. 146). The article by three physicians sums up their observations on "Meat Wrapper's Asthma" and states in part (*id.* at 146):

---

8. Plaintiff described her conversations with Dr. Scholdager at several points in her deposition testimony. When asked whether he ever gave her a diagnosis of her condition, she replied (III R. 44–45),

A. Yes, he said I had acute spasmatic brochial asthma. And then I asked him– that's when I began to think that maybe it may be caused from my working conditions. And he says, well, how long have you been a meat wrapper. And I told him, and he said, well, I kind of doubt it. You've worked at that so long, but we didn't realize it could have been caused by some–inhaling the smoke because I just couldn't place it then. And then during that time I tried to work. And I went to work at two or three of the Market Basket stores. And I noticed then that I couldn't breathe around–when I was working. Had to leave work early. And when I went back to him I mentioned this and he said well it could be because of inhaling the smoke.

Q. And this was about what time frame are you talking about now?

A. It was in March, April of 1973. He said it could be caused by inhaling smoke.

We have recently treated three patients who are employed as meat wrappers and who had severe respiratory problems. In all three, the onset of respiratory difficulty followed exposure to fumes produced by cutting with a hot wire a plastic film made of the common polymer, polyvinyl chloride. *We are reporting these cases because we suspect the phenomenon is not uncommon, yet it has not been reported previously in the medical literature.* (Emphasis added).

The article states later that "[t]he problems posed by our patients is whether fumes generated from *heated* polyvinyl chloride are toxic ..." and concludes (*id.* at 148):

### Conclusion

Although the cause of the syndrome is unclear and we have only described three cases, it seems advisable to call this matter to general attention to gain some idea of its prevalence and to inform physicians and their patients of the potential hazard of fumes from polyvinyl chloride film.

Further indications of the uncertainty of knowledge of the disease and its causation are detailed in the margin.[9]

Dr. Wells treated plaintiff after her move to Oklahoma City in 1973, first seeing her on April 12, 1974. In his deposition he stated that she had developed asthma by July of 1972; that her asthma was on an intrinsic basis and nothing she was exposed to at the time he was treating her was causing allergy and precipitating asthma; that it was probable that something she encountered in her occupation as a meat wrapper did have some bearing on her medical condition at that time; and that it was "very probable" that plaintiff's condition comes within the broad term "meat wrappers' syndrome." (IV R. 27–28). Dr. Wells also stated that by the time of the deposition he had reached no conclusion as to whether either the PVC fumes or other fumes which came from heat–pressing gummed labels against the meat packages or both had caused plaintiff's ailment, though he did suggest that either or both could be a cause. He indicated that there was not enough knowledge of the nature of the disease to be able to determine when the PVC would have first precipitated the condition in plaintiff. And he said that he doubted that she had as intense an exposure to irritant substances from pollution as she did to those from her occupation. (*Id.* at 32, 38).

Plaintiffs' answers on November 26, 1975, to interrogatories stated that Social Security benefits for disability have been drawn by her, that the nature of such disability is "damage to my sinuses and bronchial

9. These indications came primarily from the testimony of plaintiff's expert chemistry witness, Dr. Block, and from that of her treating physician, Dr. Wells. Dr. Block testified that the brown–black oily substance which plaintiff found on her face and hands, on a shelf above the wrapping machine, and in her hair when shampooing it, was not something she necessarily would have associated with decomposition of the wrap since she was "chemically untrained." II R. 57–58. He also testified that from his limited reading of the medical literature as a non–physician and from his reading of the chemical journals he had not reached the conclusion that the problem of the cause of plaintiff's condition had been resolved. (II R. 90–91). Dr. Block's uncertainty on these matters was expressed in his deposition taken on November 18, 1976.

Dr. Wells confirmed this uncertainty when he testified that he had found few articles published on the disease (IV R. 27); that he did not have "enough basic knowledge of the nature of the disease" to be able to pin down the earliest date of causation of the disease in plaintiff and that he did not think that information existed (IV R. 31); and that he did not know if it was "possible for anybody to" tell whether the cause of the asthmatic condition was a change of the wrapping process being used or a systemic change in the patient or just from long exposure. (IV R. 34). Dr. Wells also testified that he had not seen any patient before where he "questioned the involvement of being a meatwrapper." (IV R. 35). Finally, Dr. Wells stated that "[i]f Mrs. Williams had been available to the people that were writing the articles on meat wrapper's syndrome, I think it's very likely that she would have been studied and probably be part of the medical literature on this particular disease." (IV R. 27).

We feel this evidence provides additional support for the conclusion that lay and medical knowledge of the disease was not well developed at the critical period of time.

tubes," that the extent is "total permanent damage," that the length of time thereof was "a little over three years," beginning "in the summer of 1972, definite date undetermined. (Permanent)." (I R. 86).

█ Like the *Schiele* case, this case is not free from doubt. It is true that there were tentative indications to plaintiff Williams in Dr. Scholdager's March or April 1973 discussions of some possible relationship of her illness to her employment. However, we are bound by the rule that "[T]he movant must demonstrate entitlement [to a summary judgment] beyond a reasonable doubt and if an inference can be deduced from the facts whereby the non—movant might recover, summary judgment is inappropriate." *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33, 36 (10th Cir.); *Webb v. Allstate Ins. Co.*, 536 F.2d 336, 340 (10th Cir.). Where different ultimate inferences may "be drawn from the subsidiary facts contained in the affidavits, attached exhibits, and depositions submitted below ... the inferences ... must be viewed in the light most favorable to the party opposing the motion [for summary judgment]." *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176. And where the issue of limitations involves determinations like those required here, summary judgment cannot be granted unless the evidence is so clear that there is no genuine factual issue and the determinations can be made as a matter of law. *Schiele v. Hobart Corp., supra,* 284 Or. 483, 587 P.2d at 1014; *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 494 F.2d 168, 171–73 (10th Cir.); *Saylor v. Lindsley*, 391 F.2d 965, 970 (2d Cir.); *Hoelflich v. William S. Merrell Co.*, 288 F.Supp. 659, 662 (E.D.Pa.); *see Sheets v. Burman*, 322 F.2d 277, 278, 280–81 (5th Cir.); 6 *Moore's Federal Practice* ¶ 56.17[58] at 56–1062–63 & n.10.

█ Considering the whole record and the differing inferences reasonably possible with respect to the knowledge of the disease on the part of plaintiff as a reasonably prudent person in 1973, we cannot agree that the record supports a summary judgment dismissing plaintiff's case on limitations grounds. We are persuaded to agree with the conclusion of the Oregon Supreme Court reversing the summary judgment in its similar PVC case that "we cannot say as a matter of law that a reasonably prudent person would have apprehended more than two years prior to the commencement of plaintiff's action that she was being seriously or permanently injured." *Schiele v. Hobart Corp., supra,* 587 P.2d at 1014. Thus we cannot say that the record sufficiently demonstrates under the standard for a summary judgment that the plaintiff knew, or as a reasonably prudent person should have known, that she had the condition for which her action was brought and that the defendants had caused it, for such a period of time that her action was barred by the two year limitation.

Accordingly, the summary judgment founded on limitations must be set aside.

### III

█ One question remains. In its memorandum of "Uncontroverted Facts and Conclusions of Law" which followed the grant of summary judgment, the district court included a conclusion of law that "[t]here is no concealment which would toll the statute of limitations involved in this case." (I R. 335).[10] Since the limitation issue is going back under our disposition, we should consider whether the judgment should also be set aside on this point.[11]

---

10. This issue involves the Oklahoma rule that fraudulent concealment constitutes an implied exception to the statute of limitations. *See Wills v. Black & West Architects*, 344 P.2d 581, 584 (Okl.). A party who wrongfully conceals material facts, and thereby prevents a discovery of his wrong, or of the fact that a cause of action has accrued against him, is not allowed to take advantage of his own wrong by pleading the statute. *Waugh v. Guthrie Gas, Light, Fuel & Improvement Co.*, 37 Okl. 239, 131 P. 174.

11. Even if it should be found that plaintiff's cause of action accrued more than two years before the commencement of suit, her claim would not be barred if she established her concealment theory under Oklahoma law to avoid the limitations bar.

At trial, in order to establish such concealment to avoid the bar of limitations, the burden of proof rests on the plaintiff. *See Waugh v. Guthrie Gas, Light, Fuel & Improvement Co.*, 37 Okl. 239, 131 P. 174, 179. Plaintiff's responses to defendants' motions for summary judgment claimed fraudulent concealment and argued that it tolls the statute of limitations. The testimony of two witnesses seems relevant on this issue.[12] Defendants vigorously deny that such concealment has been shown. (Answer Brief of Appellee Borden at 24; Answer Brief of Appellee Goodyear at 10–11). The district court's conclusion on this point is not a factual finding after trial, which would be considered under the clearly erroneous standard of Rule 52, F.R.Civ.P., 9 *Wright & Miller, Federal Practice and Procedure* § 2575 at p. 693; *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1377 (10th Cir.); *Tygrett v. Washington*, 543 F.2d 840, 844 n.17 (D.C.Cir.); it is a summary judgment ruling reviewed instead under the strict standard of Rule 56. *Luckett v. Bethlehem Steel Corp., supra*, 618 F.2d at 1377. Viewed in this light, without expressing any view of the ultimate validity of the concealment theory we cannot say that the issue was ripe for summary judgment.

In sum, the summary judgment for defendants is set aside and the cause is remanded for further proceedings in accord with this opinion.

---

12. The deposition testimony of two witnesses, Messrs. Cummin and Block, has some pertinence on the issue but cannot be said to be conclusive on the concealment theory.